Please call the next case. Counsel, please. Good morning. May it please the Court and Counsel. I'm Charles Cohen on behalf of the petitioner appointed Raymond Norkus. The principal argument here is that the ruling of the commission as affirmed is against the manifest weight of the evidence. Why should the commission credit Beck over Carroll? That's really what this case boils down to. I'm sorry? This case boils down to two doctors. That is correct. That's what it is. Why should the commission have dismissed Carroll and instead credited Beck with the positive? Dr. Beck is the only doctor, and there only are two doctors who have expressed opinions on the connection issue, who recognize the fact that the particular heart issue that Mr. Norkus suffered from a ventricular tachycardia could be caused by stress, by physical exertion. Dr. Carroll, on the other hand, in my opinion, I'm not saying more in my opinion, just read his report, very much beat around the bush as to this point. He's more than willing to give us the somewhat irrelevant fact that physical exertion could cause a heart attack or what he refers to as an ischemic event. Was Dr. Trigger correct when he quoted Dr. Carroll to say, I see no connection between the alleged work-related events of either February 26th, February 27th, and either Mr. Norkus' condition or the St. James Hospital at that time or his need for medical treatment at that time or thereafter? No, that is not correct, and Dr. Carroll was not correct. Dr. Carroll never does us the favor of discussing the man's- Wait a minute, let me go back first. Are you saying the arbitrator is wrong when he says that's what Dr. Carroll said? It's what Dr. Carroll said, but Dr. Carroll was wrong, and Dr- Is the arbitrator correct when he quoted Dr. Carroll? Was the quote correct? I mean, he was correct in quoting Dr. Carroll, but Dr. Carroll was wrong with his conclusion. I'm not disputing the arbitrator's quoting of Dr. Carroll's conclusion, but what I'm saying is Dr. Carroll's conclusion is wrong. Because Dr. Carroll's conclusion basically also- one of the most important parts, I believe, is that the arbitrator was in some ways misled by what Dr. Carroll was saying. We noted three essential deficiencies with regard to Dr. Carroll's report. Dr. Carroll only really acknowledged the reader's report. You'd think that the only physical activity that Mr. Norquist performed was driving. They refer to the infamous Question 2. Dr. Carroll's report includes a section where he discusses his conclusions, and then a section where he discusses- he answers a series of questions propounded by defense counsel. I refer to the Question 2. Did the petitioner's job duties of February 27, 2002 of driving his truck and eventually, quote, just not feeling well, quote, cause or contribute to his heart attack? Well, Dr. Carroll does correct counsel that it wasn't a heart attack. It was an abnormal heart rhythm. But he goes on to explain that it was not caused by a coronary occlusion, and he discusses- not necessarily in this response, but the whole thing- it was not a heart attack. He discusses ischemic and non-ischemic events and explains in detail that stress or exertion can cause an ischemic event such as a heart attack, but doesn't tell us one way or another whether it can cause a non-ischemic event like a tachycardia or arrhythmia. Was the arbitrator correct in talking about Dr. Beck and his reasoning? Dr. Beck is the only doctor in this case who acknowledges, yes, physical exertion, stress physical, can cause this particular type event. But you have a problem. You have it because he says temporarily. His opinion talks about an exertion, and you have a time frame. You have that great alleged physical exertion a day prior. And then you have at least 20 minutes transpiring between just tightening a load on the truck of these coils. And you don't have anyone to talk about contemporaneous. Nobody talks- the closest we come is Dr. Beck indicating that it happened right before, and there was physical exertion fairly close in time. He did do physical exertion securing a load of spring steel, which apparently he moved and secured at Kankakee. And then he was driving, in my perception, based on distance. It had to have been less than a half an hour to when his sentence rose. Is the arbitrator correct when he said about the claimant's own testimony that the loading and unloading, according to the claimant, took place more than a full day before the onset of the sentence? No, we're talking there about- Is that correct? There's two different things. I'm talking about the exertion the same day. There's also the big exertion, which was the day before when he was levering 3,000 to 4,000 pounds of rebar using some kind of- I forget what kind of levers exactly he was using just to lever rebars. That was a full day before. That was more than 24 hours before the onset of the irregular heartbeat. Yes, it was. Do you see the problem? Yes and no. Yes, the main- the big thing and the thing that was more than 24 hours before. But there was a continuing history of other exertions the day of the event. He had to secure a load when he first got to his truck at Admiral Steel that morning. Then he had to do exertions after he got the load to the location. And then he gets to Kankakee and gets this load of spring steel, which he had to move and secure at that point. And he acknowledged feeling soreness after he did the load of spring steel at Kankakee. Now, admittedly, that's not as big an exertion as the one we spoke of the day before. But there's a whole history of exertions going over two days' time period. And the only guy who even acknowledges physical exertion can cause a tachycardia is Dr. Beck. He doesn't connect it up because there is some ostensible inconsistency between the testimony of the claimant and when the arrhythmia occurs. There's also another salient factor here. Your client has a well-documented history of irregular heartbeats going back many years before he went to work for this company, correct? Yes, that's true. So how does that – what is your understanding or interpretation of how that enters into consideration? Well, first of all, that makes him a predisposed individual. And second of all, the science is, as Dr. Beck speaks, that there is a connection between physical exertion and arrhythmia. And that's why I keep coming back to the case which we perceive is extremely similar. I don't think you can get more on point factually than the case of Cotty of Tiswell. Well, we didn't have Dr. Carroll here at all. Just forget Dr. Carroll. All you have is Dr. Beck. You say that this record factually supports Dr. Beck's view of exercise, irregular heartbeat, and the condition this person experienced, right? Yeah, well, there's the notation that Dr. Beck made just a few weeks after he got out of the hospital in March of 2002, and the other observation that he made in a little more detail in December 2005. He didn't remember his first observation, but he pretty much said pretty much the same thing in 2005, yes. And we feel that those things do show that physical exertion can – causes these type of events. Do you have an opinion that Dr. Beck says the exertion on the day caused this? It's vague, but I think it's there. Okay, so it is vague. I don't know how – Then how is it that the opposite conclusion is clearly present, even – Because as vague as he is, he is much less vague than Dr. Carroll, who avoids the issue. I just said we didn't have Dr. Carroll. Okay, I see. Assuming you don't have Dr. Carroll. I believe it's enough there to say that there is a causal connection between physical exertion and a tachycardia. He acknowledges that those two things are related. In both of his comments, both the ones close in time and the one more distant in time from the event, he acknowledges that physical exertion and tachycardia are connected. And that's why I keep going back to the County of Tesco case. That can be found in a medical book. Yeah, well, that's the whole point. But you don't have the killer question and answer here that says, on that day, when he tightened the load, 20-some minutes before he went to the restaurant, that that activity triggered his irregular heartbeat and his condition he experienced. Well, he considers it connected, or he wouldn't have put those notations as he did in the first place. Obviously, he perceives a connection between physical exertion and tachycardia. And that's all I can say. Now, I said right before. What is right before? Does it have to be 10 seconds before, or can it be 20 minutes? And in my perception, that is still close enough in time, and the symptoms arise while he's choosing. Did anybody have a chance to ask the doctor that question? No. We asked the doctor, and basically to put it in his notes, is I understood the doctor, for whatever reason, did not testify, and it's my understanding he was having some personal problems at the time. For whatever reason, he was not asked to give a deposition. It's my understanding he had some personal problems, so he did not give a deposition. So what he said is what is there. So you're not disputing that the tachycardia did not occur contemporaneously with the exertion? There is a time gap there, albeit more so in your opinion, correct? Yes, but I acknowledge there's a time gap, but I don't think it's a big enough time gap. And he says right before, and I don't think that has to mean 10 seconds. I think in the whole history of things, I think it's rational that there continues to be a connection. His vision went out, and he began to feel these things within a fairly short period of time after the last exertion when he secured the spring steel, and he said the minimum of 20 minutes went by, correct? I wouldn't guesstimate about that amount of time. I can't say precisely. He was driving from Kankakee, and he got as far as the vicinity of Monee, and this is where it occurred. And all I can do is estimate based on geography how far away he was. And that's when it happened. I think it's close enough, and I think the evidence is there, the circumstantial evidence is there, that it was close enough. And furthermore, that's why I keep going back to this County of Tazewell case where the man didn't even have a history of physical exertion. He was operating a snow plow for long hours, and I feel the exertion that we spoke of here is more significant than that. But as my learned colleague, Justice Holder, was alluding to, you can't take an opinion specific to the facts of that case and elevate it into some general rule that's applicable to all persons with preexisting heart conditions. That's what you're sort of trying to do here. Every case, causation has to be established individually, does it not? Okay. Obviously, but I feel that Dr. Beck did establish the causation, and the science is the science. And at least in County of Tazewell, both the response doctor and petitioner's doctor acknowledged that exertion causes tachycardia. So that's a rule now established throughout the law. Well, I'm not saying no. It's not law, but the science is the science. And Dr. Beck says the science in our case. Yeah, but in that case, you had a doctor saying this claimant doing this activity, fatigue, in this instance, led to the condition. Do you have that same type of evidence or testimony here? Or do you have a generalized statement? We have what Dr. Beck said, and I believe that that, in my perception, and we have what Dr. Beck said is what Dr. Beck said, and I feel it goes there. I just definitely feel it goes there in a much more honest way than anything that Dr. Carroll and his discussions of ischemic and non-ischemic does. And that was one of the whole points I really need to go back to, is what arbitrator O'Malley said in his decision, which seems to indicate that he perceived it because Dr. Carroll said this was a non-ischemic event and therefore it's not compensable. He said, Dr. Carroll explained that physical exertion can precipitate acute cardiac events such as heart attacks due to ruptures or occlusions in the coronary artery, but noted neither scenario was seen in this case. He explained such a disruption of flow in the coronary artery is seen in a heart attack resulting in a lack of blood flow downstream condition known as ischemia. Counsel, your time is up. You'll have time for rebuttal. Okay. Counsel, please. Thank you. May it please the Court. Counsel, Jim Moran for the respondent, Doug Lavery. The commission's decision was not against the manifest rate of the evidence. It is the province of the commission to resolve conflicting medical testimony. Well, it really is. What good is Carroll here? Is this an ischemic event or non-ischemic event? It's a non-ischemic event. All of the physicians in the medical records say it's a non-ischemic event. Okay. So what do you have Carroll saying about non-ischemic events? Anything? As I read his report, he is saying that non-ischemic means that the problem did not result as a result of lack of blood flow. That's the definition of non-ischemic. Yes. You could read that in a textbook, too. Pardon me? You could read that in a textbook. Absolutely. What Dr. Carroll uses that as a rationale for why, in this case, the ventricular technicardia was not a result of the events. That is, he notes that in the hospital, the petitioner was diagnosed with an enlarged heart and ventricular fibrillation, and he says that he sees no relation between the events of February 26 and February 27 and that onset. Rather, he said that multiple studies indicate that in people with enlarged hearts, that they are prone to spontaneous onset of these conditions. That's his rationale. With regard to Your Honor's question, with regard to the accuracy of the arbitrator's notation, this is Dr. Carroll's report. Quoting from page 2, Respondent's Exhibit 8, I see no connection between the alleged work-related events of either February 26 or February 27, 2002, and either Mr. Norquist's medical condition noted at St. James Hospital at that time, or his need for medical treatment at that time or thereafter. Now, it's important in this case, when we look at the fact that the Commission chose to discount Dr. Beck's opinions, to actually note what Dr. Beck said, because it's somewhat inconsistent with what counsel argued. He's relying, in arguing that this Court should impermissibly re-weigh the evidence, he's relying upon two notations. The first, from 2002, states as follows, Quote, it seems that what started was prior to this mystery, he levered 3,000 pounds of rebar off his truck, and the next thing he knew ended up having ventricular fibrillation. Of course it wasn't the next thing he knew. It was approximately 28 hours later. Three years later, he re-addressed the issue, and this note is even more important. He states, quote, he was driving a steel truck and apparently in the process of loading and then unloading the steel. Now listen to what he says next with regard to causation and how important the timeline is. He states, quote, if he was doing it right before the event and it is temporarily associated, I would tend to believe that it certainly may have been contributed to his problem. He is qualifying his opinion with the presupposition that it occurred, quote, right before the event. Well, how would you define right before? Your opposing counsel is saying 20 minutes is arguably right before. Well, he references his understanding, first of all, that the Petition was in the process of loading and unloading. He, in the earlier one, that the next thing he knew was that he had the onset of these symptoms. Now I can't define exactly what the next thing we know is or right before the event, but I can tell you that I don't think it means while driving 25 miles away in Monique. And it certainly is not our burden to prove that. And most of all, it certainly was the Commission's province to make that determination. Not counsel's relying on what he feels it may be. It was the Commission's province to judge. It's exactly the type of issue they're charged in their expertise with weighing whether right before means 25 minutes in this case or not. With regard to the County of Tazewell case, counsel is citing that not for any legal precedent or legal doctrine, but rather as a matter of forensic dogma. That's a case that was decided 30 years ago, and it involved different exertions over a different time frame, in a different environment, involving a different individual, and with a different medical profile. So to say that 30 years later that that case is a piece of forensic dogma means that this case must be decided in this way is to say that the differences, all those differences, are inconsequential. And it's also to say that medical science has remained stagnant over the intervening 30 years. Now the final argument is this idea of bias. Counsel has, I think it's proper to discuss the facts in law that you believe support your case, but I think we exceed fair argument when you accuse the arbitrator of, quote, an anti-petitioner bias. Now certainly all of us say or write things sometimes that are interpreted or heard differently, but in counsel's reply brief, where he clarifies, he states, quote, the use of the word bias was only questioning of the arbitrator's ideology, end quote. That disparages not only the arbitrator, but a unanimous commission panel that affirmed the arbitrator. In order to show bias, you must show an abuse of discretion. That standard hasn't even been mentioned, let alone any facts cited in support of it. So in conclusion, it was the commission's province to weigh the evidence, and to weigh Dr. Beck versus Dr. Carroll, and to view Dr. Carroll more favorably. Dr. Beck's conclusions were clearly inconsistent with the petitioner's own testimony at trial. The case was decided on the merits. It was properly confirmed by the circuit court and should be affirmed by this court. Thank you, counsel. Thank you. Rebuttal, please. Just briefly addressing that bias. I note initially that you couldn't convince Commissioner Mason or Rink of taking a different position. Well, all I know is that I perceive that what I know is that arbitrator O'Malley seemed to indicate from his words that he perceived the fact that this was a, quote, non-ischemic event as an essential factor. And he goes over Dr. Carroll's discussion of ischemic events and says this wasn't one of those. So he perceived this being a non-ischemic event as being a deciding factor is what I was trying to get at. And I think that was a mistake. And I understand that the commission affirmed it. But I think the commission missed the point, too, that arbitrator O'Malley perceived it because it was a case. Could you point that out to Commissioner Mason? I'm not sure if it was pointed out. Similar arguments were made in briefing before the commission with regard to that, with regard to the fact that Dr. Carroll never honestly discusses whether a non-ischemic event, the tachycardia, can cause a, can be caused by physical exertion. But the essential factor is that Dr. Carroll's report, while he says that the events of the two days did not cause this, he never discusses any event, any physical exertion other than driving. The only physical exertion ever mentioned in all the pages of his report is the word driving. We don't know. He never says that the rebar thing from the day before, oh, that's too far to be connected, or that any of the other physical exertions that the man testified to were too far. So that was the first thing. And he doesn't discuss the physical exertions. He doesn't discuss the question of whether physical exertion can cause the tachycardia. And we don't, and he doesn't discuss the issue of the temporal connection. Did this exertion, the one the day before, any of the exertions the day of, were they close enough or were they too far? So he doesn't go there. And that's what's wrong with Dr. Carroll's report. And as I indicated, the discussion of ischemic and non-ischemic was essential to Arbitrator O'Malley's ruling, and I think he missed the point. And finally, just on a bias point, the thing that bothered me and may have caused that to be put there in the first place had to do with the fact that Arbitrator O'Malley commented about the fact that the latter comment of Dr. Beck apparently was because we asked him to make, to express an opinion on the point. So we mentioned it was, but he mentioned, makes no deal of the fact that obviously the other report is an independent medical evaluation. I don't think that there should be, our asking a doctor for an opinion should be viewed in any less favorable light than the respondent asking the doctor for an opinion. And I don't mean, and I never meant to impugn anybody's integrity. Thank you. Thank you, counsel. The court will take it under advice.